### JOHN LANHAM v. THE STATE.

1. CONSTRUCTION OF STATUTE. — An act of 1879, which contained an "emergency clause," changed the times of holding the District Courts in the Twenty-second Judicial District; but a *proviso* in the act required that the first term held under it should be held in C. County, which term in C. County was fixed by the act for the third Monday of September, 1879. *Held*, that, notwithstanding the "emergency clause," the *proviso* operated to postpone any change in the times of holding the said courts until the first term could, in compliance with the act, be held in C. County; and that, in the interim, the antecedent act fixing the terms of the courts remained in force. *Graves* v. *The State*, 6 Texas Ct. App. 228, cited approvingly on this question.

2. CHARGE OF THE COURT. — In a trial for murder, the defence asked that the jury be instructed, in effect, to consider no evidence which implied the existence of better evidence not produced or accounted for, and, with this view, to consider whether the testimony of by-standers implied that a certain person who was first assailed by the defendant could, if produced, have given better evidence than the by-standers. *Held,* correctly refused, because invasive of the province of the jury; and because, if not a direct charge on the weight of evidence, it was likely, if given, to be construed by the jury as disparagement by the court of the evidence adduced.

3. PRACTICE. — Objections to the admissibility of evidence cannot be raised by asking instructions to the jury. They should be taken when the objectionable evidence is offered. If, when evidence is introduced, it is found to imply the existence of better evidence, a motion to exclude it is the proper practice; and if the motion was overruled, a bill of exceptions would bring up the ruling for revision on appeal.

4. EVIDENCE. — The testimony of belligerents cannot be supposed to be better evidence of what transpired in an exciting *rencontre* than that of by-standers who witnessed but were not engaged in it.

5. COSTS IN CAPITAL CASES. — To its judgment on a capital conviction, the court below appended a judgment against the defendant for all costs, which is assigned as error on the ground that, contrary to constitutional inhibition, it "seeks to forfeit the appellant's estate," and because it "subjected his estate to the costs of the prosecution," contrary to the article of the Code which provides that, "in case of the execution of a convict, or where he is imprisoned for life, there shall be no forfeiture of any kind to the State, nor shall any cost of prosecution be collected from his estate." *Held,* that these constitutional and statutory provisions are applicable and operative after the judgment in such a case has gone into effect, when, if infringed, they are available to the convict's representatives. It is the better practice, however, to render no judgment for costs in such cases.

6. PRACTICE IN THIS COURT. — Express authority is vested in this court to reform and correct judgments of the courts below. Rev. Stats., Code Cr. Proc., art. 869.

7. FACT CASE. — See evidence held sufficient to support a conviction for murder in the first degree.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. NOONAN.

By indictment filed October 24, 1878, John Lanham was charged with the murder of Georgie Drake, by shooting her with a six-shooter pistol, on the 3d of August, 1878. It is seldom that the facts and details of a case of this character are elicited so distinctly and consistently as those

narrated in the record made up on his appeal from the judgment of death by hanging, based on his conviction by the jury of murder in the first degree. The trial was had on the 22d of May, 1879.

The defendant and the deceased, it appears, were members of a theatrical company conducting the " Green Front Theatre " in the city of San Antonio, which seems to have been patronized by soldiers of the United States army stationed there, and a few of whom were conspicuous though involuntary characters in the tragedy which terminates so fatally for the appellant.

India Carrera, a member of the company, was the first witness introduced by the prosecution. Her testimony was as follows : —

" I went to the theatre on Saturday night, August 3, 1878, to work. When I passed back to the stage, I saw the defendant and Georgie Drake talking. They were upon the stage, and Georgie looked as if she had been crying ; and the defendant was very much excited. He had a pistol in his hands. After talking awhile with Georgie, in my presence, he shook the pistol under my nose, and said : ' They got the best of me last night, but to-night I will give them a *matinée*.' I replied to him, ' Don't be foolish, but put your pistol up.' I then went into my dressing-room, and defendant and Georgie went into another room and talked there a few moments. The defendant then went out on the street, and Georgie came to my room and said : ' I am afraid Johnnie has a pistol, and he is going to shoot some one.' I will go down and tell them.' Georgie then left me on the stage, and went down on the floor of the hall and began talking with Squires, Tibbits, and others.

" The defendant was out about fifteen or twenty minutes, when I saw him returning to the hall, passing near where the deceased was standing ; and after passing the deceased, I saw Squires following, and calling to him, ' Johnnie !

Johnnie! I have nothing against you; let us have no difficulty.' The defendant made no reply, but passed on to the rear of the building, and to the door leading into the wine-room. He passed up the steps to the wine-room floor, and Squires reached the bottom as the defendant reached the top of the steps. I was then in my dressing-room, and there was a door leading from it into the wine-room, and the defendant was standing in full view, opposite this door. While in this position I heard Squires's voice at the bottom of the steps, saying, ' Johnnie, put up your pistol; I have nothing against you.' The defendant instantly shot the pistol at Squires. Squires then ran up the hall towards the bar, and the defendant followed after him, and shot at him a second time. He fired a third shot, and then ran up to where Georgie Drake, the deceased, was standing, and shot her down.

" My dressing-room, in which I was, had been a private box, and there was a window from which I was looking, and could observe everything going on or transpiring on the floor. I saw Georgie fall at the fourth shot, throwing her hand to her face. The smoke from the pistol had become so thick I could not well distinguish objects, and thought it might be my sister, whom I was expecting to enter the door near where the deceased fell; in fact I thought two persons had fallen at that place, but one was a man who had stooped down to help Georgie just as she had fallen.

" I left my dressing-room and went to where Georgie had fallen, and they took her up very soon and carried her in the back yard. She was taken from there and carried to the Sisters' Hospital, where she died next morning. The ball entered her chin and came out at the back of her neck. Her face was badly powder-burned about the wound.

" I had a conversation with the defendant on Friday, the day before the killing. It seems there had been a misunderstanding between Georgie Drake and the defendant. On Thursday before the killing, he handed to my sister

and self two fifty-dollar bills, and told us to give it to Georgie if she would make friends with him. On Friday he called on us, between 9 A. M. and 4 P. M., and asked us what Georgie said. We told him she said he had whipped and mistreated her; that she would not make friends with a man who would treat her in that manner, and refused to take the money. We handed it back to him, and he said: ' I will kill her, then, if she don't do it.' I do not remember the exact hour this conversation was had, but it was between my breakfast-hour, at 9 A. M., and my dinner-hour, at 4 P. M.; I know this because I remember of our talking about it at the dinner-table. On Saturday, before the killing, I talked with the defendant again. He was very angry, and said he ' would get even with them yet; ' that he would ' have a *matinée* ' of his own. This all occurred in Bexar County, State of Texas."

The cross-examination elicited nothing additional, except that the witness understood the defendant to have reference to Squires and Tibbits when he said, "They got the best of me last night, but I'll get even with them to-night."

The next witness for the State was James Harper, who seems to have been a cook or a waiter in the service of the establishment. About half an hour before the killing, as he was starting back from the theatre, to which he had just carried supper, he had a conversation with the defendant, who said to the witness, "Hold on, I want to see you a moment." They sat down in the doorway of the theatre, and defendant asked witness, "Did Squires stay with Georgie last night?" Witness replied, "I don't know; reckon he did; he was there this morning." Defendant then said, "She has done me a mean trick, and before she shall live with anybody else I will kill her." Witness told him not to get into any trouble about her, and he said, "Jim, my mind is made up; I intend to kill her and them soldiers too; I won't give her up to them soldiers. I will make my escape if I can; if I cannot, I'll kill myself; I am not going to be

arrested." Witness left, and hastened to dissuade the deceased from going to the theatre, telling her what the defendant had just said to him. She replied, "Ah, get away, you son of a gun!" and she then went on to the theatre. Witness returned to the theatre, and saw her with Squires, Tibbits, and some other soldiers, standing in the hall, near the rear end from the stage, talking. The defendant passed near by them, going towards the wine-room, when Georgie Drake said to Squires, "There goes Johnnie, now; go and tell him that you have nothing against him." Squires said, "No; I don't want to say any thing to him." Georgie said, "Yes, for my sake tell him." Squires then followed the defendant towards the wine-room, and the shooting ensued substantially as already narrated by India Carrera, the first witness.

On cross-examination, the witness stated that he heard the defendant and Squires quarrelling the Thursday night before the killing. As the defendant and Georgie were returning together from the concert that night, witness heard her say to the defendant, "Don't strike me any more." Then Squires ran up and knocked the defendant down with his fist. Defendant picked up a rock and knocked Squires down, and then went off and stayed away all night. The next morning, Squires and Tibbits went to the house of Laura Davis, where the deceased was boarding; they had their pistols on. Defendant came, and they had a talk, made friends, and settled their difficulty; and then Squires and Tibbits unloaded their pistols and hung them up in a tree. Defendant came into the kitchen, where witness was cooking, and from which they could see Squires and Tibbits in the yard. The defendant pulled out his pistol and said, "I have a good mind to shoot the guts out of those sons of bitches." Witness told him to go away, and he went; and then witness told Squires and Tibbits what the defendant had said, and Squires reloaded his pistol and said, "If he makes a move at me, I will kill him." That

night twelve soldiers came to Laura Davis's, while the defendant was upstairs in Georgie's room. Some of the soldiers went into the room, and Georgie went into another room. One soldier said, "There is nobody in here;" and another said, "Yes; there he is, under the bed." One of them, named Buck, said, "Pull the son of a bitch out, and let us throw him out of the window." Laura Davis interposed, telling them she wanted no one killed at her house. When the conversation between witness and defendant took place on Saturday evening, about half an hour before the killing, the defendant was "drinking some, but not drunk; he knew what he was saying and doing."

Henry Ansell, for the State, testified that between three and four in the afternoon of the day of the homicide the defendant said, in the presence of witness and F. Howard and E. Hart, that he intended to kill Georgie Drake that night, and somebody else whom he did not name.

Charley Davis, for the State, testified that when Georgie Drake was killed he kept the lunch-stand at the theatre, and was there when it occurred. Just before it was done, the defendant came to the lunch-stand, and said to witness, "I am going to have a *matinée* here to-night." Witness replied, "Nonsense!" Defendant then ran his hand in his pocket, pulled out a roll of greenbacks and some gold, and said, "Here is money enough to bury me if I don't get away. I am going to do some shooting, and will kill two soldiers and Georgie Drake, — get away if I can, and if I can't, I intend to kill myself." He further said, "They have had their day, and I am now going to have mine;" and then immediately passed into the hall. The subsequent incidents were related by the witness in substantial accord with the testimony of Harper and India Carrera. This witness, however, stated that the defendant's third shot took effect in the arm of a citizen named Bailey, and that the shot which killed Georgie Drake was fired by defendant when he got within four or five feet of her, and as she threw up her

hands and exclaimed, "My God, Johnnie!" The deceased had boarded and lodged at witness's house for about two weeks before the homicide, and the defendant lodged with her every night until the Thursday night before he killed her. They had a difficulty that day, and he did not lodge with her afterwards. The witness said that the defendant was usually very quiet, and had but little to say, but that on the day of the homicide he was talking a great deal. When he was talking to witness, just before the killing, he walked straight, and seemed to have control of his mental faculties; "he was intoxicated, but not what I call drunk."

Dr. Cupples, introduced by the State, testified to his examination of the wound, and described the direction and effects of the bullet. On cross-examination, he stated that the course of the bullet indicated that the deceased was leaning forward when the shot struck her, or else that it was fired from an elevation.

The State examined two other witnesses who were on the spot where and when the deceased was killed. Their testimony was, in every particular of any consequence, identical with that already narrated. One of them stated that the deceased had invited Squires and Tibbits to call for and escort her to the theatre, but that on the evening of the homicide she had left her boarding-house for the theatre before they called for her.

The defence introduced Dan Ryan, who testified that he saw the defendant about ten o'clock on the day of the homicide, and again about three or four o'clock in the afternoon. "He was under the influence of liquor; he was not in his usual frame of mind, but was excited and angry." Witness saw him take a drink or two in the morning, and two or three in the evening. In the afternoon, John Hunt and the defendant were out driving in a buggy.

John Hunt, for the defence, testified that he and the defendant were out buggy-driving through various streets

in San Antonio from about one o'clock to half-past three on the day of the homicide. They took a great many drinks *en route*, — the witness enumerating seven places at which they drank, and implying an indefinite number besides. On cross-examination, he stated that about three o'clock the defendant stopped on Main Street and bought a new six-shooter.

A. Reaver, for the defence, stated that he had known the defendant for some two years, and gave him an excellent character for sobriety, industry, trustworthiness, and peacefulness. On cross-examination, this witness testified that about two o'clock on the day of the homicide the defendant hired from him the buggy in which defendant and Hunt took their drive. Defendant returned the buggy in about two hours. Witness did not observe or suspect that the defendant was drinking, either when he got or returned the buggy. This closed the evidence in the case.

The court charged the jury amply and clearly upon murder in the first and in the second degree, and upon malice express and implied. At the instance of the defence, the jury were instructed upon the legal effect of drunkenness as explanatory of conduct or indicative of want of motive, and all the charges asked by the defence were given except the one set out in the opinion and held to have been properly refused. All other matters appear in the opinion of the court.

*W. C. Belcher*, for the appellant. The attention of this court is called to the judgment rendered in this cause, wherein it seeks to forfeit appellant's estate, and directly subjects it to the costs of this prosecution. This is contrary to our Bill of Rights and statute, and would be sufficient and proper cause of reversal without being assigned for error, since it is apparent from the face of the record and goes to the foundation of this action. Const. 1875, Bill of Rights, sect. 21 ; Pasc. Dig., arts. 1664, 1581.

In considering the third and fourth assignments of error, we ask the court to carefully peruse the evidence. From this it is obvious that one Squires, a soldier, was the person against whom appellant bore malice, the person attacked, and with whom appellant had previous difficulties; that in the fatal affray Squires was the person whose life was sought, — he was the principal actor in the drama. Parts of his acts and declarations were, in the progress of the trial, detailed by witnesses that came upon the stand, from which it was apparent, after the evidence was closed, that his testimony was the best evidence which the case was susceptible of producing, and superior to that adduced by other witnesses. No reason was given why he was not made a witness, nor was his absence accounted for. Under these circumstances, the court was asked to charge the jury to exclude such " evidence as implies that better evidence exists," etc. In refusing this charge, we contend that the court erred. 1 Greenl. on Ev., sect. 82; *Porter v. The State*, 1 Texas Ct. App. 394; *Barnell v. The State*, 5 Texas Ct. App. 115.

While the charge as requested may not have properly presented the question to the jury, it was sufficient to call the court's attention to the subject, and it should have given a charge appropriate to the question presented. *Ferrell v. The State*, 43 Texas, 507.

We deem the verdict contrary to the law and the evidence, and present the same in the fourth assignment of error. An attentive examination of the facts shows that appellant's malice was towards Squires, and not the deceased; and that deceased was accidentally killed as she entered the door of the theatre, by a shot that was intended for Squires and his fellow-soldiers. This is not murder in the first degree. *Farrer v. The State*, 42 Texas, 271; *McCoy v. The State*, 25 Texas, 33.

We would respectfully urge that the offence committed could not be murder in the first degree, because appellant,

admitting for the sake of argument that he was not insane from intoxication, after having fired three shots at and while pursuing the soldiers, was not in a condition to take deceased's life with a sedate mind and deliberate design, nor could he then have been executing a previously formed design against the deceased, with whom he had held a friendly conversation "upon the stage" not more than five minutes before the fatal occurrence.

*Thomas Ball*, Assistant Attorney-General, for the State.

WHITE, P. J.  John Lanham, the appellant in this case, was indicted in the District Court of Bexar County, at the October term, A. D. 1878, for the murder of one Georgie Drake.  The deed was alleged to have been committed on the third day of August, 1878.  On his trial, which took place on the twenty-third day of May, 1879, he was convicted of murder of the first degree, with his punishment affixed at death by hanging.

A jurisdictional question was raised in the motion to arrest the judgment, on the ground that "the act of the Sixteenth Legislature changing the times of holding the courts in the Twenty-second Judicial District did not authorize the holding of a term of the District Court in Bexar County between the eighteenth day of April and the twenty-fourth day of May, A. D. 1879 ; and that this law is the only one regulating the times of holding courts in this district, all others being in conflict with and repealed by it."  Acts 16th Leg., Gen. Laws, p. 106.

This identical question was raised in the case of *Graves* v. *The State*, 6 Texas Ct. App. 228, which was a case appealed from the District Court of Bexar County, and it was there held that the antecedent act of 1876, prescribing the times and terms of holding the District Courts in the Twenty-second District (Gen. Laws 15th Leg., p. 11), controlled and regulated the subject, its provisions being oper-

ative until the act of 1879 went into effect. Agreeably to the law as announced, and so well supported by authority, in the Graves case, the court did not err in overruling defendant's motion in arrest of judgment.

It is urgently insisted in the brief of counsel for appellant that the court erred in refusing to give in charge to the jury a special instruction in the following language: " The jury, in framing their verdict, will consider all evidence not excluded in the progress of this trial, except such evidence as implies that better evidence existed and is withheld or not accounted for; and in this connection it is proper that the jury consider whether the evidence adduced by other witnesses implies that the party first assailed by defendant would have been competent to give better evidence than that adduced." Several objections suggest themselves to this instruction, which in our judgment fully sustain the action of the court. Two only will be noticed. *First*, it sought to invade the province of the jury by telling them what evidence they should consider and what reject from their consideration; *secondly*, if not a direct charge upon the weight of evidence, it was certainly calculated to impress upon the jury that in the opinion of the court the proof adduced was not the best and most satisfactory of which the case was susceptible, and that in consequence the court doubted its sufficiency to establish the crime alleged.

Objections to the admissibility of evidence cannot be raised by asking instructions to the jury. *Nalle* v. *Gates*, 20 Texas, 315. In practice, the proper mode of reaching the matter sought to be attained would have been, when the evidence was proposed, to have objected to it; or, after it was adduced, to have moved to exclude it on the ground that it presupposed the existence of better testimony which was withheld or not accounted for. Then, had the court overruled the motion, a bill of exceptions reserved to the action would have submitted the subject appropriately for revision. Where this has not been done, the duty of this

court in examining the record will be to see that the conviction is sustained by a sufficient amount of legal and competent testimony.    Correctness of the rules of evidence as declared in *Porter* v. *The State*, 1 Texas Ct. App. 394, and *Barnell* v. *The State*, 5 Texas Ct. App. 115, cited by counsel, is not doubted, and in a proper case and under proper circumstances, as in those cases, would, where it had not been adduced, require a reversal of the judgment for want of the best evidence.    In the case we are considering the rule does not apply, under the facts established. Here the whole transaction occurred in the presence and hearing of the witnesses who have testified.    They were persumably in a better position to see, hear, and recollect everything that was said and done by the parties actively engaged than the parties themselves, who were at the time assailed, fired upon, and fleeing from the defendant.    It is unreasonable to suppose that these latter parties, in the excitement incident to their situation, could or would see, hear, and recollect more distinctly what was said and done than third parties who were only spectators of, and not participants in, the thrilling events.

A single bill of exceptions appears in the record, and that was saved to the ruling of the court in refusing to permit the witness Ryan to answer a question propounded to him by defendant's counsel, the question being, " What was the opinion of the witness in regard to the condition of defendant on the day of the killing."    In signing this bill the judge says, in explanation : " The witness Hunt was required, before giving any opinion, to give all of the particulars of his intercourse with the defendant on the day of the shooting, which he did, — minutely and in detail stating where they went, what they did, and what they drank ; and then he stated the condition of defendant according to his opinion, as will be seen by the statement of facts in the cause."    We take it that in writing the above the judge has by clerical error inserted the name of Hunt instead of Ryan.

This presumption is borne out by a reference to Ryan's testimony, who says: "I know defendant, and saw him on the day that Georgie Drake was killed; I saw him take a great many drinks, and I drank with him; he was under the influence of liquor; he was not in his usual frame of mind, but was excited and angry." It is apparent from this extract from the testimony of this witness that he was not only not prohibited from expressing his opinion as to the condition of the accused, but that he has done so, it seems, as fully as he was capable of doing. One of the theories of the defence was that defendant, when the homicide was committed, was intoxicated to an extent that he was irresponsible for his actions. Every opportunity to make it good, if possible, was, it appears to us, afforded defendant. In addition thereto, defendant's counsel framed and submitted to the court special instructions with regard to this defence, which were given in charge to the jury without change or modification by the court. No error is made to appear in this connection.

Some objections are urged to portions of the charge of the court. These we have considered attentively, and find them untenable. In its presentation of the law the charge is fully sustained by precedent, and was directly and pertinently applicable to the particular facts developed in the evidence.

Another supposed error grows out of the judgment rendered in the case. After the usual formulary, including a copy of the verdict, the judgment proceeds: "Whereupon it is ordered, adjudged, and decreed by the court that the defendant, John Lanham, be hung by the neck until he is dead; that he now be remanded to the county jail, and that he be there securely kept by the sheriff of Bexar County until the execution of this judgment, hereafter to be pronounced by the sentence of this court. *It is further ordered by the court that the State of Texas do have and recover of and from the said defendant all costs herein*

*expended.''*   We have italicised the last recital, which is the portion specially complained of as error.

It is urged that this provision of the judgment ''seeks to forfeit appellant's estate, and directly subjects it to the costs of this prosecution;'' that this is contrary to our Bill of Rights, and in contravention of the express provisions of our statute; that it is a fundamental error, apparent of record, and sufficient to require a reversal of the judgment.

We find the twenty-first section in the Bill of Rights, art. 1 of our Constitution, declares that ''no conviction shall work corruption of blood or forfeiture of estate.'' With regard to capital cases and felonies, where the punishment is assessed at imprisonment for life, our statute provides: ''In case of the execution of a convict under sentence of death, or where he is imprisoned for life, there shall be no forfeiture of any kind to the State, nor shall any cost of prosecution be collected from his estate.'' Pasc. Dig., art. 1664; Rev. Stats., Penal Code, art. 60.

We do not see how the defendant in this proceeding can avail himself of these constitutional and statutory provisions. It is evident that these provisions can only apply to that state of case when the judgment of conviction has actually gone into execution. When the convict has suffered the penalty of death, or when he is undergoing a life-term of imprisonment in the penitentiary, then the statute inhibits the collection of the costs from his estate. In such event the question might well and successfully, we think, be raised by his heirs, or those entitled to the estate, against any effort to render it liable to the payment of the costs of the prosecution. The judgment in regard to costs is not void, but voidable in such cases at the instance of the convict's representatives. Even if that portion of the judgment was void, it would not necessarily invalidate the other portions which are not objectionable; for, under authority expressly conferred by statute, this court might and would

reform and correct its defects.    Pasc. Dig., art. 3208 ; Rev.
Stats., Code Cr. Proc., art. 869 ; *Prince* v. *The State*, 44
Texas, 480 ; *Cain* v. *The State*, 20 Texas, 355 ; *Cordova*
v. *The State*, 6 Texas Ct. App. 455.    We are of opinion
that the proper practice would be to omit rendering a judg-
ment for costs in such cases as are mentioned in the stat-
ute.

It only remains now to look at the sufficiency of the evi-
dence, which is also controverted on this appeal.    A calm
and most serious consideration of it in all its aspects and
bearings must, we think, convince and satisfy beyond doubt
any unprejudiced mind that the prosecution has most fully
established the charge preferred in the indictment.

Defendant and deceased had lived together for some time
in criminal intimacy.    He suspected and charged her of
criminal intimacy with others.    This caused difficulties, dis-
putes, quarrels, blows, and a separation between them, and
a fight ensues between defendant and his favored rival the
day prior to the killing.    Defendant determines to have
revenge.    He tells his friends that he intends to kill
the soldiers who have interfered between him and his
paramour, and to more than one, on the day of the killing,
he expresses his determination to take the life of the
deceased.    During the day he stimulates himself with
strong drink, and in the evening purchases the pistol to be
used in the "*matinée*" which he says he is to have, and to
which he invites his friends.    With a purpose firmly and
deliberately fixed, he goes to the theatre where the tragedy
is to be played which he has concocted, and there, whilst his
intended victims are endeavoring to soothe and palliate his
anger with assurances of good-will and friendship, he turns
upon them and without reply begins the firing.    Three
shots are aimed at the fleeing " soldiers."    He then turns,
and, advancing upon deceased, who is standing off some
distance powerless and evidently appalled at the scene, he
fires upon her at such proximity that her face is powder-

burnt. The bullet passes through the face, fractures the spinal column, and comes out at the back of the neck. His victim falls to the ground, and death ensues from the effect of the wound. So soon as the fatal shot is fired, defendant flees. Is any thing wanting to make this a case of murder in the first degree, — a murder on express malice? If so, we have failed to discover it.

Impressed with the deep solemnity of the issue involved, we have considered the record with all the care the gravity and importance of the case required. We have found in it no such error with regard to the law or facts submitted to us in the record as would authorize us to disturb the judgment, and it is therefore affirmed.

*Affirmed.*